Filed 6/12/13  P. v. Warren CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ELIZABETH LUCILLE WARREN,<br><br>      Defendant and Appellant. | E055443<br><br>(Super.Ct.No. RIF140799)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan, Judge.  Affirmed.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and A. Natasha Cortina and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Elizabeth Lucille Warren woke up, still drunk from the night before, and found her infant son Jared dying or dead.  According to an expert forensic

1

pathologist, the pattern of redness on the baby's body indicated that something heavy was compressing it when he died. Had the pathologist known that an intoxicated adult was sleeping in the same bed with the baby, he would have concluded that the baby died because the adult lay on him, and he was unable to breathe. Defendant insisted, however, that she had put the baby to sleep in a reclining stroller.

A jury found defendant guilty of involuntary manslaughter (Pen. Code, § 192, subd. (b)) and felony child endangerment (Pen. Code, § 273a, subd. (a)), with an enhancement for causing harm resulting in death (Pen. Code, § 12022.95). As a result, defendant was sentenced to a total of eight years in prison, along with the usual fines and fees.

Defendant's sole appellate contention is that there was insufficient evidence that she caused the death of her son. Defendant's adult daughter, however, testified that defendant habitually slept in the same bed with her infant children. This, along with the pathologist's testimony, plus other evidence showing defendant's consciousness of guilt, constituted sufficient evidence that defendant caused the baby's death.

I

FACTUAL BACKGROUND

A.    *General Background.*

Defendant worked as a registered nurse, but on her days off, she would binge drink. Her "drink of choice" was Bacardi rum, straight from the bottle. Sometimes she drank to the point of throwing up or passing out.

2

Defendant's eldest child, Natasha, was 26 at the time of trial.  According to Natasha, when defendant's younger children were babies, they usually slept in the same bed with defendant.

B.     *Previous Incidents.*

In 2003, Natasha called the police.  She told them that she had found defendant lying on top of her brother Karl, who was then two years old.  Defendant's body was completely covering his.  She had to push defendant off.

By the time of trial, it was Natasha's recollection that a mattress — not defendant — was lying on Karl.  Defendant was in the room but so drunk that Natasha was not sure "if she knew what she was doing."  Karl's face was white, and he looked "more scared than [she] had ever seen him . . . ."  When she called the police, Natasha testified, defendant tried to take her cell phone away from her.  As a result of this incident, defendant's children were placed in foster care.

On September 9, 2006, defendant's mother called the police and reported that defendant had been drinking for approximately 48 hours.  At the time, defendant was seven or eight months pregnant with Jared.[1]  When the police went to defendant's house and "bang[ed]" on the doors, there was no response.  After seeing defendant inside, lying on a couch, the police entered through an open window.  At first, when they shook her,

---

[1]     The spelling of Jared's first name is uncertain.  In some places, it is spelled Jerad, and in others, Jared.  As no definitive source, such as the birth nor the death certificate, is in the record, we will use the usual and common spelling.

3

she was unresponsive, but then she awoke. When they asked her what day it was, she said September 19, 1987. She was taken to a hospital.

A social worker then contacted defendant to assess the safety of her other children. The social worker counseled her about the risks of drinking while pregnant. Ultimately, the child (or children) then living with her were taken away and placed with Natasha.

C. *The Birth and Death of Jared.*

On October 13, 2006, Jared was born, prematurely. He weighed 5 pounds 12 ounces. He appeared to be "unhealthy [and] fragile . . . ."

On November 8, 2006, around 5:00 p.m., defendant phoned her ex-boyfriend and the father of two of her children. She was so drunk that he could not understand her.

The next morning, November 9, 2006, defendant's mother called 911. She reported a baby who was breathing but limp and would not wake up. Defendant could be heard in the background saying, "Don't call 911." Defendant then told the 911 operator that she was going to take the baby to the emergency room, but the operator told her to wait for the paramedics.

Around 8:10 a.m., paramedics arrived. Defendant's mother was on the front porch, holding the baby. He had no visible injuries. However, there was a small amount of blood in his nose and the back of his throat. He was not breathing, and he had no pulse. Rigor mortis had set in to the point that the paramedics could not straighten his arms to insert an intravenous needle (IV). His face was mottled due to pooling of the blood, which "usually [means] . . . the patient's been dead so long that no resuscitative

4

efforts could bring him back . . . ." Even though the paramedics could have pronounced him dead, they decided to try to resuscitate him — to "do everything humanly possibl[e] to try to save this baby . . . ." When their efforts failed, they transported him to a hospital, where he was pronounced dead.

Defendant's home was filthy. However, the police did not find any alcohol or any empty alcohol bottles. There was a crib in the house, but it was not usable because "stuff was being stored in it." Inside a bedroom, the police found a stroller. It reclined, so a baby could have lain down in it. When they found it, however, it was reclined only slightly — the back was not even halfway down.

In the kitchen, on a drying rack, the police found a onesie. There were spots of what appeared to be blood by the neck; the area where the spots were was damp. The police sent the onesie to the Department of Justice for testing but never got any results back.

When the police interviewed defendant, a little after 10:00 a.m., she appeared to be under the influence of alcohol. Her shirt and jeans were both on backwards. At first, defendant said she had not been drinking. When asked, "Are you sure[?]," she said she had had one glass of wine at 7:00 p.m.

Defendant said that she had gone to sleep on the couch in the living room with Jared asleep in the stroller next to her. At 4:00 a.m., she claimed, she fed him and put him back in the stroller. At 7:30 a.m., she woke up; she tried to wake the baby, but he was nonresponsive. However, she thought he was breathing.

5

At 12:12 p.m., a sample of defendant's blood was taken.  When tested, it indicated a blood alcohol level of 0.04.  According to an expert toxicologist, this meant that earlier, at 8:00 a.m., defendant's blood alcohol level would have been about 0.10 or 0.11, if she was a moderate social drinker, or as high as 0.16, if she was a heavy drinker.

Dr. Joseph Cohen, an expert forensic pathologist, performed Jared's autopsy.  He testified that the baby's head, neck, upper arms, and upper torso were a "vivid red."  The red area was "fairly well demarcated" from the normal skin tone on the rest of the body.

Dr. Cohen explained that the redness was due to a combination of livor mortis and suffusion.  Livor mortis is pooling of blood after death, due to gravity.  It would become visible within several hours after death.  Suffusion is pooling of blood before death, because the blood cannot return to the heart.  It could be caused by the weight of an object compressing the rest of the body.  It would be visible immediately.  Dr. Cohen concluded that "during the dying process, there was some compression of Jared's body."

There were no significant external injuries.  Internally, there were fresh hemorrhages in the lungs.  This was due to "pressure changes in the lungs," which could include "[c]ompression of the body that leads to inability to breath[e] . . . ."  The hemorrhages would account for the blood seen in the baby's nose and mouth.

Dr. Cohen ruled out sudden infant death syndrome, fetal alcohol syndrome, seizure disorder, a brain hemorrhage, a bacterial infection, a heart defect, or alcohol or drug ingestion as the cause of death.

In Dr. Cohen's opinion, "the pattern of suffusion looks . . . like an overlay" – i.e., when a parent rolls over onto a child while "co-sleeping." It was not consistent with the baby being found in a stroller. He concluded that the evidence was "supportive of and suspicious for some type of body compression," though it fell short of being "compelling." Hence, he listed the cause of death as "'[u]ndetermined, cannot exclude asphyxia.'" However, if he knew that the baby had been sleeping with an intoxicated adult, he would have concluded that the cause of death was "asphyxia due to overlay while co-sleeping." Moreover, if he knew that defendant regularly slept in bed with her infant children, "it may be a clincher. It may actually make . . . a difference."

D.  *Defense Evidence*.

Defendant testified on her own behalf. She admitted drinking while pregnant. However, she claimed that, the night before Jared died, she drank only "a couple glasses of wine."

Consistent with her statement to the police, defendant testified that she slept on the couch while Jared slept in the stroller in the living room. At 4:00 a.m., she breastfed Jared, but he ate for only a minute or two, then went back to sleep. She put him back in the stroller. At 7:30 a.m., when it was time for his next feeding, he would not wake up.

She called her mother for "emotional support." Her mother suggested going to the hospital. Defendant went to get dressed. If she put her clothes on backwards, it was because she was in a hurry.

Defendant's mother then decided to call 911.  Defendant said "Don't call 911" because she had heard bad things about the local ambulance company and hospitals, so she wanted to take the baby to the UC Irvine hospital, where she worked, instead.

Defendant admitted that the UC Irvine hospital was at least 40 to 60 minutes away.  She claimed, however, that at that point, the baby was breathing, moving, and warm, so she did not think there was any emergency.  She also admitted that she did not check his pulse and did not take off his clothing to check his body.  She did not "recall" seeing any redness.

Defendant's mother agreed that, when she arrived, the baby was breathing and had a pulse.  She, too, denied seeing any redness.

II

THE SUFFICIENCY OF THE EVIDENCE OF CAUSATION

Defendant contends that there was insufficient evidence that she caused Jared's death.

"'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' [Citation.]  '"[O]ur role on appeal is a limited one." [Citation.]  Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.]  Thus, if the circumstances reasonably justify the trier of fact's findings, the

opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citation.]' [Citation.]" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.)

Natasha testified that it was defendant's custom and practice to have her infant children sleep in bed with her. In a previous incident, defendant passed out on top of her son Karl when he was a toddler. Defendant claimed that she put Jared to sleep in the stroller, in the living room; however, the stroller was found in the bedroom, and it was not in a reclined position. Also, Dr. Cohen testified that Jared's injuries were inconsistent with him having been in the stroller when he died.

According to Dr. Cohen, the well-demarcated area of suffusion found on Jared's body demonstrated that, at the time of death, something was compressing him. Moreover, the hemorrhages in his lungs were consistent with asphyxia due to compression. Dr. Cohen ruled out other causes of death.

Furthermore, there was no evidence that any heavy object other than defendant's body was or could have been compressing Jared. Had there been such an object, defendant would have seen it and could have testified about it. It was reasonably inferable that defendant caused Jared's death by lying on top of him.

Basically, defendant argues that, because Dr. Cohen concluded that the cause of death was "[u]ndetermined," the jury was required to come to the same conclusion. However, "[e]xpert opinion is not binding on a jury. The jury is free to reject even the uncontradicted testimony of an expert witness. [Citations.]" (*People v. Engstrom* (2011)

9

201 Cal.App.4th 174, 187, fn. omitted.) "On appeal the inquiry with respect to the sufficiency of evidence does not differ because a verdict may reflect a rejection of the opinion of one or more experts . . . . [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 933, fn. 4.)

Dr. Cohen admitted that, if he had known that defendant had a history of co-sleeping, he might have concluded that the cause of death was asphyxiation by overlay — "it may be a clincher." Unlike Dr. Cohen, however, the jury heard evidence that defendant *did* have a history of co-sleeping. Thus, Dr. Cohen's opinion and this evidence, put together, constituted substantial evidence that this was the cause of death.

Defendant also points to Dr. Cohen's testimony that he did not find any pinpoint hemorrhages in the baby's eyes. Dr. Cohen agreed that pinpoint hemorrhages are one of the signs of asphyxiation, but he also testified that they are not found in every case of asphyxiation. Moreover, he testified that "infants don't develop them as easily as adults . . . ." Thus, the absence of pinpoint hemorrhages did not require the jury to reject asphyxiation as the cause of death.

We also note that defendant displayed consciousness of guilt. She told her mother not to call 911. She tried to prevent the paramedics from responding by telling the 911 operator that she was taking the baby to an emergency room. She claimed she did not notice any redness, even though Dr. Cohen testified that the suffusion would have been visible immediately and even though the paramedics noticed it. There was evidence that defendant had tried to wash drops of blood off of Jared's onesie.

10

Defendant also apparently lied about the time of death. She claimed (as did her mother) that Jared was still alive — warm, moving, and breathing — which was why she did not think there was an emergency. According to the paramedics, however, Jared was already dead when they arrived; they could not even insert an IV because rigor mortis had set in.

We conclude that this evidence, taken together, constituted sufficient evidence that defendant caused Jared's death.

## III

## THE SUFFICIENCY OF THE EVIDENCE

## OF WILLFUL CHILD ENDANGERMENT

At oral argument, defendant asserted that there was also insufficient evidence that she acted willfully to support her conviction of felony child endangerment. She forfeited this contention by failing to raise it in her opening brief. (*People v. Lynch* (2012) 209 Cal.App.4th 353, 362, fn. 6.)

Even if not forfeited, it lacks merit. While defendant may have been unconscious at the moment when she overlay her baby, there was evidence that she regularly chose to get drunk on her days off, and she regularly chose to sleep in the same bed with her infant children. As a result of the incident involving Karl, which led to her children being taken away from her, she had actual knowledge that this was dangerous. This was sufficient evidence that she "willfully cause[d] or permit[ted] [a] child to be placed in a situation where his or her person or health is endangered . . . ." (Pen. Code, § 273a, subd. (a).)

11

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.

12