Filed 9/7/16  P. v. Nelson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B261378 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA110447) |
| v. | |
| JAMES E. NELSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted James Nelson of attempted voluntary manslaughter, as a lesser included offense of attempted murder. There was some evidence the jurors briefly discussed the fact that Nelson did not testify at trial in his defense. We conclude that the trial court did not err in denying Nelson's motion for a new trial because the admissible evidence of jury misconduct was not prejudicial. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

A.     *Michelle Barnes and Her Children*

Michelle Barnes has three children, all of whom were detained by the juvenile court in 2008. Her oldest child, J., was placed with Ester Nelson, who lives in a house in Compton, and whose brother is the father of one of Barnes's other children. Ester Nelson is thus the aunt of one of Barnes's children, but not J. J. sometimes plays at the house of a next-door neighbor, Christina Valencia, with her son.

In 2008 and 2009, Barnes had monitored visits with J., usually at a fast-food restaurant. These visits were sometimes monitored by Ester Nelson, and sometimes by social workers or others. Barnes also had monitored (by Ester Nelson) telephone conversations with J. Whether Barnes could have monitored visits at Ester Nelson's house was disputed.

The relationship between Barnes and Ester Nelson deteriorated after the juvenile court placed J. with Ester Nelson. Barnes was displeased with the care Ester Nelson was providing for J. The two women argued about this, and Barnes complained about Ester

---

[1]     Because Nelson's appeal from the trial court's denial of his motion for new trial involves only the issue of juror misconduct, we summarize the facts briefly in a light most favorable to the judgment. (See *Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1; *Superior Gunite v. Ralph Mitzel Inc.* (2004) 117 Cal.App.4th 301, 304, fn. 1.)

Nelson to the juvenile court and county social workers.  By the time of trial in this case, Barnes had custody of J. again.

B.    *December 24, 2009*

On December 24, 2009 Barnes went to Ester Nelson's house to bring J. Christmas presents.  She had made arrangements for the visit with Ester Nelson in advance.  Harold Griffin, whom Barnes had been dating since approximately 2007, accompanied her to Ester Nelson's house, but he stayed in the car while Barnes visited J.  The visit lasted less than five minutes, and Barnes had no dispute with Ester Nelson.

C.    *December 25, 2009*

On Christmas morning, 2009 Barnes called J.  J. asked Barnes to bring him a plate of food she had cooked.  Barnes believed Ester Nelson was monitoring the call, and thus knew she was coming.

Later that day, between 4:30 p.m. and 5:00 p.m., Barnes drove to Ester Nelson's house to bring J. the plate of food.  Griffin again accompanied Barnes, and sat in the passenger seat of the car.  When they arrived, there were no parking spaces adjacent to the curb, so Barnes parked in the middle of the street in front of Ester Nelson's house, and Barnes called Ester Nelson on her cell phone.  A young woman's voice answered, and then hung up.

While Griffin remained in the passenger seat of the car listening to music, Barnes walked up to Ester Nelson's house and rang the doorbell.  When a man opened the door, Barnes asked if J. was there.  The man said he was not, and closed the door.  Barnes then walked to Valencia's house next door, thinking that J. might be there, playing with Valencia's son.  Barnes spoke with Valencia on the front steps of her house, and learned J. was not there.

At some point, Ester Nelson's adult son James Nelson (Nelson), who has been confined to a wheelchair since the age of 14, came down the driveway of his mother's house in an electric wheelchair.  Nelson approached the passenger side of Barnes's car,

3

where Griffin was still seated.  Nelson began cursing at Griffin, accusing him of disrespecting his mother, and telling him to leave his mother alone.  Griffin said he did not understand what Nelson was talking about, and tried to ignore him.  Nelson then went around behind the car to the driver's side, opened the door, and spit in Griffin's face.  Nelson continued to scream and curse at Griffin, and yelled, "I'm gonna fuck you up."

Griffin got out of the passenger side door and called to Barnes that it was time to leave.  As Barnes walked back to her car, Nelson approached her in his wheelchair.  Nelson said, "Get the fuck away from here.  Y'all leave my mama alone."  When Barnes asked Nelson what he was talking about, Nelson said he had spit in Griffin's face and "he didn't do shit."  Barnes then spit at Nelson.

Nelson ran over Barnes's foot or ankle with his wheelchair, and the two of them began exchanging punches.  According to Barnes, she was trying to defend herself and get Nelson off her.  Barnes's dress became caught in Nelson's wheelchair and was torn.  Griffin got out of the car, ran towards Barnes and Nelson, and tried to separate them.  Griffin again yelled at Barnes that it was time to leave, and he immediately went back to the passenger side of the car.  Griffin had opened the passenger door and turned to look back at Barnes and Nelson, when Nelson removed a gun from "his waistband" or "groin area" and started firing at him.  Griffin got inside the car.

Ester Nelson came out of her house with another woman and said, "Don't do that, James Earl, don't do that."  But Nelson fired five or six shots while Griffin lay across the front seat of the car.  Barnes, who was standing next to Nelson as he fired, "heard clicking coming from the gun."[2]  Nelson said again, "I'm gonna fuck you up."  Barnes then got into her car, called 911, and drove Griffin to the hospital.

Griffin had bullet wounds in his right ankle and heel, his right knee, his right thigh and his left thigh, all of which he suffered after he had taken cover in the car.  He was in

---

[2]    Valencia was inside her house and did not see who fired the gunshots.   Ester Nelson, who came outside when she heard the argument, also did not see who fired the shots.

4

the hospital for five or six days, and had surgery to remove a bullet from his knee. Barnes had an abrasion and swelling on her ankle, and swelling on her face. The rear passenger window of her car was shot out, and there were bullet holes in the front passenger seat and under the steering wheel and the emergency brake.

On January 12, 2010 sheriff's deputies went to Ester Nelson's house with an arrest warrant for Nelson, but he was not there. Although before the shooting Nelson was often at his mother's house, he stopped going to her house after the incident. Nelson was arrested on May 24, 2010 during a traffic stop based on the outstanding warrant for his arrest.

### D. *The Charges and the Verdict*

The People charged Nelson with attempted murder (Pen. Code, §§ 187, 664),[3] assault with a firearm (§ 245, subd. (a)(2)), two counts of battery (§ 242), and two counts of making a criminal threat (§ 422). The People alleged that Nelson personally used, and personally and intentionally discharged, a firearm that caused great bodily injury, and that he personally used a firearm in the commission of a felony or attempted felony. (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d).) The People also alleged that Nelson personally inflicted great bodily injury on a person other than an accomplice during the commission of a felony or attempted felony. (§ 12022.7, subd. (a).)

During trial the court granted Nelson's motion to dismiss the two battery counts. The court also granted Nelson's motion to dismiss one of the two counts of making a criminal threat (as to Griffin) and denied Nelson's motion to dismiss the other count of making a criminal threat (as to Barnes).

The jury found Nelson not guilty of attempted murder, but found him guilty of the lesser included offense of attempted voluntary manslaughter. The jury also found Nelson guilty of assault with a firearm, and not guilty on the remaining count of making a

---

[3]     Undesignated statutory references are to the Penal Code.

criminal threat. Finally, the jury found true the firearm and great bodily injury allegations.

E.    *The Motion for a New Trial and Sentencing*

Nelson filed two motions for a new trial, one prepared by his attorney, filed March 5, 2013, and one he prepared while representing himself, filed December 9, 2013. In the motion prepared by his attorney, Nelson argued he was entitled to a new trial because the court erroneously dismissed a juror because of his views on law enforcement, the prosecutor engaged in misconduct by eliciting testimony that Nelson was on parole, and the jurors engaged in misconduct by discussing Nelson's failure to testify. Counsel for Nelson supported the motion with his declaration, in which he stated, "After the trial had concluded, I spoke with juror number three and she told me that during the deliberations the jurors discussed the fact that . . . Nelson did not testify in his own defense. She stated that during the deliberations the question was raised; 'I wonder why he [Nelson] didn't testify?' Then there was a brief discussion about reasons why Nelson may not have testified, and then the jurors moved on to another issue." Counsel for Nelson also stated in his declaration, "Juror number three further informed me that the verdict[s] of guilty on the charge of attempted voluntary manslaughter and assault with a firearm do not represent her verdict. She informed me that a verdict of not guilty on all counts was an accurate representation of her verdict."

In the motion for a new trial Nelson prepared while representing himself, Nelson argued that he had received ineffective assistance of counsel, the court erred in denying his motion for self-representation, and "[t]here was juror misconduct in deliberations where the jurors discussed [his] failure to testify in his own defense." Nelson's motion for a new trial included a declaration by one of the jurors, who stated, "During jury deliberations we briefly discussed the fact that [Nelson] did not testify in his own defense. During deliberations the question was raised; 'I wonder why he [Nelson] didn't testify?' There was then a very brief discussion and we then moved on to another issue." The juror also stated, "The verdict of guilty on the charge of attempted voluntary

6

manslaughter does ***not*** represent my verdict; the verdict of not guilty on the charge of attempted voluntary manslaughter would accurately represent my verdict."

At the hearing, the court stated it had read and considered the motion filed by Nelson and the motion filed by Nelson's former attorney. The court stated, "On all the grounds set forth in each of those motions, and I'm doing that to protect your rights so all those issues are before the appellate court if you think I'm wrong, I'm going to deny the motion for new trial on each of those grounds." The court's minute order made clear the court was denying both the motion filed by Nelson and the motion filed by Nelson's former attorney. The court sentenced Nelson to an aggregate prison term of 18 years. Nelson appealed.[4]

## DISCUSSION

Nelson cites to four statements that he argues amount to prejudicial jury misconduct. They are (1) the statement in trial counsel for Nelson's declaration that a juror told him the jury briefly discussed Nelson's failure to testify; (2) the statement in trial counsel for Nelson's declaration that a juror told him that the guilty verdicts did not represent her verdicts; (3) the statement in the juror's declaration that the jury briefly discussed Nelson's failure to testify; and (4) the statement in the juror's declaration that the guilty verdicts did not represent her verdicts.

Statements (1) and (2) are not admissible because they are hearsay statements by counsel, which cannot establish juror misconduct. "Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an

---

[4]     Nelson's notice of appeal was untimely, but this court granted Nelson's application for relief from default for failure to file a notice of appeal.

7

evidentiary hearing."[5] (*People v. Manibusan* (2013) 58 Cal.4th 40, 55 (*Manibusan*); see *People v. Dykes* (2009) 46 Cal.4th 731, 810, 811 [because "'" a jury verdict may not be impeached by hearsay,'"'" "ordinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay"]; *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1468 ["a trial court does not abuse its discretion in denying a motion for new trial based upon juror misconduct when the evidence in support constitutes unsworn hearsay"]; *People v. Villagren* (1980) 106 Cal.App.3d 720, 729 ["a jury verdict may not be impeached by hearsay affidavits"].) Nelson concedes that the declaration of his trial counsel "does not provide substantial evidence of misconduct because it contains hearsay statements."

Statement (4), that the guilty verdicts did not represent the juror's verdict, is not admissible under Evidence Code section 1150 because it describes the juror's subjective belief about the verdicts.[6] (See *Manibusan*, *supra*, 58 Cal.4th at p. 57; *People v. Engstrom* (2011) 201 Cal.App.4th 174, 184 ["[a] verdict cannot be impeached simply because it was mistaken or erroneous"]; see, e.g., *People v. Romero* (1982) 31 Cal.3d 685, 688-689 [statements in juror declarations that the verdict was inaccurate were inadmissible because they involved "essentially subjective reasoning on the part of the jurors"]; *People v. Chaney* (1988) 202 Cal.App.3d 1109, 1121 [statements in a juror declaration, "'I personally believe that defendant is guilty of first degree murder, and . . . at no time would I agree that the defendant was not guilty,'" were inadmissible

---

[5] Nelson did not ask the trial court to conduct an evidentiary hearing, nor on appeal does he argue that the trial court should have done so.

[6] Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

8

under Evidence Code section 1150, subdivision (a), because they disclosed the juror's "personal beliefs and mental thought processes"], disapproved on another ground in *People v. Marshall* (1996) 13 Cal.4th 799, 825-826; *Bossi v. State of California* (1981) 119 Cal.App.3d 313, 317-318 [statement in a juror declaration that the jurors were not in agreement on the questions in the verdict was inadmissible because it was offered "to show the mental processes of the jurors"].) Evidence Code section 1150 prevents a juror, like the juror here, "'''from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent.'''" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281.) As Nelson concedes, "Evidence Code section 1150 does not allow for a description of the mental process [the juror] used to determine that she did not agree with the guilty verdicts found."

Statement (3), that the jurors discussed why Nelson did not testify in his defense, was admissible, and the People do not dispute that this statement is evidence of juror misconduct. (See *Manibusan*, *supra*, 58 Cal.4th at p. 59 ["[i]nsofar as the [juror] declaration indicates the jurors discussed defendant's failure to testify, it is admissible to establish misconduct"].) This discussion was improper, and it violated the court's instruction to the jury, pursuant to CALCRIM No. 355, "Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." (See *People v. Avila* (2009) 46 Cal.4th 680, 726 (*Avila*) ["'by violating the trial court's instruction not to discuss defendant's failure to testify, the jury committed misconduct'"].) The People argue, however, that the jury misconduct evidenced by statement (3) was not prejudicial and did not justify a new trial.

"Juror 'misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.'" (*People v. Sandoval* (2015) 62 Cal.4th 394, 437 (*Sandoval*); see *Manibusan*, *supra*, 58 Cal.4th at p. 59.) The presumption of prejudice from jury misconduct "'''may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.'''" (*Avila*, *supra*, 46 Cal.4th at p. 726.)

9

The presumption may be rebutted where the misconduct was "a trivial and inconsequential breach of the trial court's instruction," or where a juror's improper comments were "brief and isolated." (*Sandoval*, at p. 437; see *Manibusan*, *supra*, 58 Cal.4th at p. 59 ["'[e]very lawyer, indeed anyone with common sense, knows that . . . individual jurors do wonder why a presumably innocent defendant does not testify,'" and "'"[t]ransitory comments of wonderment and curiosity" about a defendant's failure to testify, although technically misconduct, "are normally innocuous"'"]; *People v. Hord* (1993) 15 Cal.App.4th 711, 727 ["[a] passing reference to an inappropriate matter [has been] held not to be prejudicial"]; see also *People v. Lavender* (2014) 60 Cal.4th 679, 691 ["[w]hen we talk about jury deliberations, we are talking about the conduct of human beings who are fallible," and because it is "'a rare jury trial in which there are no mistakes on anyone's part,'" "'[t]o demand theoretical perfection from every juror during the course of a trial is unrealistic'"].) "Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582; accord, *People v. Lewis* (2009) 46 Cal.4th 1255, 1309.)

Here, the presumption of prejudice was rebutted. The juror declaration stated: "During jury deliberations we briefly discussed the fact that [Nelson] did not testify in his own defense. During deliberations the question was raised; 'I wonder why he [Nelson] didn't testify?' There was then a very brief discussion and we then moved on to another issue." The juror stated twice that the discussion of Nelson's failure to testify was brief, and that the jury then moved on to discuss another issue. (See *Manibusan*, *supra*, 58 Cal.4th at p. 59 ["[t]he statement that defendant's failure to testify 'came up' suggests that any comments about this subject were merely brief and passing observations, and the record offers no basis for concluding otherwise"]; *Avila*, *supra*, 46 Cal.4th at p. 727 [misconduct not prejudicial where the discussion of the defendant's failure to testify "was not of any length or significance"]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 ["no substantial likelihood that defendant was prejudiced by the jury's brief discussion of his failure to testify" where "the comments on defendant's failure to testify mentioned in

defendant's new trial motion merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better"].) There is also no evidence that the jurors discussed the matter any further, or that the jurors used Nelson's failure to testify as evidence of guilt. (Cf. *People v. Hord*, *supra*, 15 Cal.App.4th at p. 728 [a juror's statement that "'[t]he defendant didn't testify so he is guilty'" would "go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits"].) Under these circumstances, "an independent review of the record shows no substantial likelihood the misconduct caused actual harm" (*Manibusan*, at p. 59), and the trial court did not err in denying Nelson's motion for a new trial.

Nelson argues that his "sole defense at trial was self-defense" and that the "case boiled down to a credibility contest between [him] and . . . Griffin [and] Barnes," which "elevate[d the jury] misconduct to very serious status." The existence of such a credibility contest, however, did not establish prejudice. A defendant's version of events will probably differ from a victim's version in most cases. If that were the test, juror misconduct relating to the defendant's failure to testify would almost always be prejudicial. In any event, although the jury ultimately did not believe it, Nelson presented evidence supporting his version of the incident and his theory of self-defense through the testimony of Ester Nelson and Valencia. Ester Nelson testified that Barnes came to her house on December 25, 2009 without permission, Barnes and Griffin attacked Nelson by kicking and hitting him, Griffin hit Nelson's head so hard he almost knocked Nelson out of the wheelchair, and Griffin showed Nelson "no mercy." Ester Nelson stated that Nelson was unable to defend himself, and she asked Griffin and Barnes not to hit her son. Ester Nelson testified that, although she did not see who did the shooting, she saw Griffin run away from the scene.[7] Valencia testified that Barnes "turned into the exorcist" and, with Griffin, beat Nelson "repeatedly." Valencia stated

---

[7]    Ester Nelson also testified that she saw her son earlier that day, helped him get dressed, and did not see a gun in his possession or anywhere on him.

11

that Griffin hit Nelson so hard Nelson was "lifted up off his wheelchair" and "blood went everywhere." Valencia also testified that Nelson did not throw any punches, but "was just trying to cover up because" Barnes and Griffin were beating him up. Thus, even though Nelson did not testify, the jury heard the testimony of two witnesses who supported Nelson's theory of self-defense.

## DISPOSITION

The judgment is affirmed.


SEGAL, J.

We concur:


PERLUSS, P. J.


ZELON, J.