Filed 9/16/14  P. v. Morris CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TAMOYIA DUSHAWN MORRIS, <br><br> Defendant and Appellant. | D062824 <br><br><br> (Super. Ct. No. SCD214650) |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed in part, reversed in part.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, A. Natasha Cortina and Kelley A. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found Tamoyia Dushawn Morris guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and attempted premeditated murder (§§ 664, 187, subd. (a)) in connection with a gang-related drive-by shooting in 1995.  The jury found true allegations Morris personally used a gun in the commission of both crimes within the meaning of sections 12022.5, subdivision (a), and 12022.55.

The court sentenced Morris to 25 years to life for murder, and life with the possibility of parole for attempted murder plus 20 years based on two 10-year enhancements for personal gun use in both crimes (§ 12022.55).  The court also imposed a $10,000 restitution fine, along with other fees and fines.  The court awarded actual custody credit for time served, but did not award local conduct credit based on section 2933.2.

Morris contends on appeal:  (1) the court abused its discretion in denying his motion for new trial based on juror misconduct and in declining to order an evidentiary hearing on the issue; (2) the court erred in admitting evidence Morris fled from police when stopped approximately one month after the drive-by shooting incident and in excluding evidence of other police contacts in subsequent years where he did not flee; (3) the jury instructions for murder and attempted murder confused the jury on the necessary mental state for attempted murder; (4) the jury instructions regarding consciousness of guilt (CALCRIM Nos. 371-372) violate due process because they embody an

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

unreasonable permissive inference; (5) the trial court's imposition of the victim restitution fine denied Morris's constitutional rights to due process and a jury; and (6) the court erred in failing to award presentence conduct credit for crimes predating the enactment of section 2933.2. The People concede the last point. Accordingly, we remand for determination of local conduct credits. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Shooting*

On the evening of December 9, 1995, 20-year-old Galindo "Dino" Villarreal and several neighborhood friends were hanging out in Villarreal's front yard on Guthrie Way in San Diego, talking and drinking after playing basketball. Guthrie Way is within the territory of a Blood street gang called Skyline Piru (Skyline). However, Villarreal was not a gang member.[2]

Villarreal's mother and sister had just pulled into the driveway in separate cars after being out of town and were unloading their cars when Villarreal's sister noticed a small Chevy-type sedan coming up the street. Since it was dark, she could see the car lights. Initially, the car drove up the hill fast and then slowed as it neared the house. As

_____

[2]      A detective in the San Diego Police Department gang unit testified Skyline and Lincoln Park are two of the biggest gangs in southeast San Diego based on the number of members, and are the most actively violent gang sets in San Diego. The two sets have shot and killed each other for years after a feud erupted in March 1994 when members of Skyline and an allied gang, O'Farrell Park, were suspected of killing a respected Lincoln Park member in a Lincoln Park neighborhood. Days later, Lincoln Park gang members retaliated by shooting an O'Farrell Park gang member in O'Farrell Park territory. Three months later, O'Farrell gang members fired into a Lincoln Park high school graduation party, killing a star athlete. These incidents spurred a continuing gang war.

she walked toward the house, she heard gunshots. Villarreal's sister yelled for their mother to get down. The sister saw two or three young men in the car with at least one leaning out of an open passenger window with his arm out.

Villarreal's mother also noticed the car driving slowly up the street in the direction of their home as she was unloading her luggage. She heard a "pop" noise and then heard her daughter yelling, "Duck, mom. There's a gun." Villarreal's mother ran toward the front of her vehicle and hid. She saw three young African-American males in the moving car reaching out of the car with guns and shooting in the direction of her son and the boys in front of the house. She recalled the front passenger leaning against the door and moving his arm left to right as he was shooting. The driver and another passenger in the back seat fired over the car. She saw three guns firing in the direction of the boys in front of her house and heard, "pop, pop, pop, pop."

Alicia Hopkins, a neighbor who was in her garage across the street, saw a hatchback Chevette come up the street slowly behind the Villarreal car. She heard gunshots as it got to the Villarreal house. Hopkins jumped up to see what was going on because she knew her brother and some friends were out there. She saw the right front passenger leaning out of the window shooting while another passenger on the left sat on the windowsill shooting over the roof of the car.

Hopkins' brother, A.M., was then 17 years of age and was one of the young men hanging out after playing basketball. A.M. was a member of the Skyline gang. A.M. saw a car with florescent plates circle the block twice. The second time around the shooting

4

started. A.M. dropped to the ground when he heard gunshots and saw African-American males shooting at them.

After the car left, Villarreal's mother heard her son say, "I think I've been shot." He touched his chest and fell into her arms and those of her daughter.

After the shooting stopped, A.M. noticed his friend Shaun Theobalds lying on the ground next to him. He was not moving or talking and was holding onto his chest or stomach. When A.M. checked on Villarreal, he did not look good and there was blood on his shirt.

The first San Diego police officers to respond to the scene found two victims. Villarreal, who was lying near the front door, was still breathing, but it was very labored. The first officer checked Villarreal's vitals and radioed for paramedics. Once the paramedics arrived, they worked on Villarreal "for a long period of time" but were unable to save him.

Theobalds was found lying at the street on the sidewalk with at least two gunshot wounds, one in his lower right back and one in his right knee next to an artery. Theobalds was taken to the hospital.

B.      *The Investigation*

Responding officers secured the scene and began collecting evidence including interviewing witnesses, taking photographs, and retrieving expended bullets. Evidence of missile strikes were found in the Villarreal's home, as well as that of a neighbor, in

surrounding trees, and on the sidewalk. The police recovered five .25-caliber shell casings from the street in front of the Villarreal's home.[3]

Donald McCoy, a 22-year-old who lived on the neighboring street of Cahill, discovered a blue 1987 Chevy Nova, which turned out to be stolen, abandoned on Cahill near the entrance to a canyon. McCoy, who heard gunshots and screaming followed by a police cruiser driving past his house at a high rate of speed approximately 15 to 20 minutes after the gunshots, rode his bicycle to the scene to see what was going on. As he rode up Cahill, he noticed an empty car with the windows down and the parking lights on. He thought, "Nobody does that." After learning what happened, McCoy stopped at the car on his way home and took another look. Deciding he "had to tell an officer just in case [the car] was involved in whatever happened," McCoy found an officer, took him to the car and pointed out a pathway to the canyon.

The police secured the Chevy Nova. The car had its parking lights on and the hood was warm, indicating it was recently operated. The rear right window was broken and the ignition was punched for hot wiring, which is the standard way to steal a car. The police found a .25-caliber shell casing in the car, the same caliber as the shell casings found in front of the Villarreals' home. When police escorted Hopkins to the car, she said she was 99 percent sure it was the car used in the shooting.

---

[3]    The missile is the part of a bullet that leaves the gun when fired. The shell casing is the part left behind. In a revolver, the casing remains in the gun until physically unloaded whereas a semiautomatic weapon kicks out the casing.

6

The stolen car was photographed and processed for finger prints. The prints were not initially tied to Morris because his prints were not in the law enforcement database in 1995. Ultimately, however, the prints found on the front passenger window were matched with Morris's. They were consistent with him being inside the car and extending his right arm out the open window.

At trial, a San Diego Police Department detective and gang expert opined the drive-by shooting on Guthrie Way was a "textbook" gang-related shooting. He explained a drive-by shooting in an opposing gang's neighborhood by multiple gang members would elevate their status within the gang. He also explained gangs frequently use stolen cars to commit a crime and then abandon the car to avoid detection.

C.     *Morris's 1996 Police Encounter and Flight*

On January 13, 1996, 35 days after the Guthrie Way drive-by shooting, police officers received a call regarding substantial gunfire and another call to look for an African-American male dressed in white near El Cajon Boulevard. The officer and his partner spotted Morris, an African-American male, dressed all in white, running out of an alley. The officer exited his car and ordered Morris to stop. Morris stopped and put his hands out on a car as instructed. However, once the officer caught up to Morris and tried to put Morris's hands behind his back to detain him and to pat him down for weapons, Morris pulled away and ran. The officer gave chase. As Morris scaled a fence, the officer grabbed Morris's shirt. When Morris went over the fence, he pulled the officer with him. After falling, the officer was not able to continue the foot chase.

7

Another officer, who was finishing the initial call regarding gunfire and vehicles in an alley three blocks away, continued the pursuit after learning Morris was now driving a white Cadillac. The officer saw the white Cadillac traveling eastbound on El Cajon Boulevard. Its lights were out and Morris was traveling about 60 miles per hour. The officer followed Morris as he headed southbound on 56th Street. Morris was driving about 70 miles per hour in a residential neighborhood. The officer activated his lights and siren and put out a call of a failure to yield. As they approached Trojan Avenue, the officer observed Morris lose control of his car and hit the south curb line. Morris, however, continued driving westbound on Trojan Avenue. He increased his speed to about 90 miles per hour, ran a red light and then ran through a four-way stop sign at a high rate of speed. Morris again lost control after his car came to a hump in the road, flew off the road, crashed violently down onto the roadway and then hit an electric pole. Morris attempted to flee on foot again, but officers apprehended and arrested him.

D.      *The Subsequent Investigation and Identification of Morris*

When the evidence technician who lifted the prints from the stolen Chevy Nova in 1995 became a latent print examiner in 1997, he ran the set of prints through the law enforcement database of prints to determine whether there were any possible matches. This time, Morris came up as a possible match. The examiner confirmed the identification by comparing the prints with known prints. Later, a comparison of the known prints used to identify Morris in 1997 with a set of Morris's known prints obtained in 2008 further confirmed the identifiable fingerprints found on the car were Morris's. Six sets of Morris's prints were found on the vehicle: inside and outside of the front

8

passenger window and on the door, a palm print on the trunk of the car and a palm print between the door window frame and windshield on the driver's area.

After Morris's prints were identified on the stolen Chevy Nova, detectives interviewed Morris at the Chino State Prison regarding the Guthrie Way drive-by shooting. Morris admitted he was a Lincoln Park gang member in 1995. He also acknowledged Lincoln Park and Skyline were feuding at the time.

However, when Morris was shown photos of the fingerprints on the car used in the shooting and the officer's hand placement, Morris denied knowing anything about the Chevy Nova. He said, "I can't explain it. I don't know how. You sure those are mine?" The interviewing detective assured Morris they were his prints. In response Morris briefly equivocated saying, "Well, I don't know. Could have. Anything could happen." Morris then remarked, "I don't know how my fingerprints got on that car. Nothing." He continued to deny being in the car even when the detectives suggested perhaps the car belonged to a friend. Morris denied knowing anyone with a Chevy Nova and said he had never been in a Chevy Nova saying he had a Cadillac in 1995. He also said, "I don't get in stolen cars in . . . '95."

E.     *Defense Case*

The defense called a police officer who interviewed the owner of the Chevy Nova, who reported the vehicle stolen. When the owner was interviewed in the early morning following the shooting, he advised the officer he last drove the car on December 7, 1995. He believed it disappeared somewhere between the hours of 4:00 p.m. on December 9, 1995 and 1:00 a.m. on December 10, 1995.

9

Regarding the 1996 flight incident, the defense called a witness who lived in the area of the shooting. After he heard shots fired, he looked out his window and saw a non-Black man standing by the driver's side of a dark 280z who got in the car and drove away.

The parties stipulated Morris was under parole supervision of California Department of Youth Authority at the time of the 1996 incident. The conditions of such supervision required him to obey all laws and ordinances, not to be a substantial danger to himself or to the person or property of another and not to knowingly associate with negative peers or gang members and not to participate in gang activity. The defense argued a reasonable explanation for why he ran on January 13, 1996, was because he was near a crime scene where shots had been fired and he did not want to go to jail for violating his parole conditions.

## F. Jury Verdict

The jury found Morris guilty of murder in the first degree of Villarreal and of attempted premeditated murder of Theobalds. The jury also found Morris personally used a firearm and discharged a firearm from a motor vehicle in connection with both crimes. The jury found Morris was not convicted in this proceeding of more than one offense of murder, within the meaning of section 190.2, subdivision (a)(3). The jury hung on several charges related to a separate double murder and robbery, which took place in 2005 and was referred to as the "Velma Terrace" counts. The trial court declared a mistrial as to those counts and they are not relevant to this appeal.

*G.    Motion for New Trial*

Morris moved for a new trial asserting, in part, juror misconduct. One juror used her own car to duplicate how Morris's fingerprints could have been left on the vehicle. Another juror allegedly conducted an Internet search regarding a witness in the case as well as Michael Mason's pending case regarding the Velma Terrace murders and learned Mason was going to trial after the Morris trial concluded.

After the trial concluded, Juror No. 3 told another juror and two defense attorneys she used her own vehicle at home during deliberations to try to replicate how the defendant's fingerprints were left on the vehicle found near the scene of the crime. Based on her recollection of the photographic exhibits presented during trial and available in the jury room, Juror No. 3 put her hands in the position she believed the defendants prints were located. She explained how she had to contort herself to make the prints and said her husband, who came out to the garage, called her "crazy." Juror No. 3 did not discuss this event with the other jurors during deliberations.

Juror No. 5 saw Mason, another suspect identified in exhibits from the Morris case, and a prosecutor from the Morris trial in another courtroom. According to Juror No. 6, Juror No. 5 said she searched the Internet regarding a witness in the case as well as Mason's pending case related to the Velma Terrace murders and learned Mason was going to trial shortly after the Morris trial concluded. Juror No. 6 stated she told Juror No. 5 she should stop and Juror No. 5 responded she probably would. There was no indication Juror No. 5 shared information about an Internet search with any other jurors.

11

Defense counsel attempted to conduct a similar search and presented the results of his search in an effort to demonstrate prejudice.[4]

The trial court denied the motion for new trial. The court found no basis for new trial based on the alleged Internet search. The court ruled there was no admissible evidence of what the juror may have seen in her search other than Mason was awaiting trial and declined to consider the attorney's attempt to recreate the search as speculation. Even if there was admissible evidence, the juror did not receive new evidence and the court could not invade the mental process of the juror by speculating about the effect of the search.

The court ruled there was no likelihood an Internet search about Mason influenced the verdict on the Guthrie Way charges and noted there was no verdict on the Velma Terrace charges. The court also ruled the alleged fingerprint reenactment did not provide a basis for a new trial. The jury had the photographs of the detective's reenactment as part of the evidence and Juror No. 3's actions did not generate new evidence.

*H. Sentence*

The court sentenced Morris to consecutive indeterminate terms of 25 years to life for murder and life with the possibility of parole for attempted murder plus a determinate term of 20 years, based on 10-year enhancements for personal gun use in both crimes. (§ 12022.55.) The court also imposed fines and fees, including a restitution fine of

---

[4] Although Juror No. 5 signed a declaration regarding an unrelated issue, she denied conducting Internet searches related to the Morris case.

12

$10,000. The court awarded actual custody credit of 1557 days for time served but did not award local conduct credit based on section 2933.2.

DISCUSSION

I

*Juror Misconduct Allegations*

We independently review the denial of a motion for new trial based on alleged juror misconduct. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261-1262.) "We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the conduct was prejudicial. [Citation.] In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*).) Where the facts are essentially undisputed, we independently review the legal question of "whether those facts constitute misconduct." (*Ibid.*)

A.      *Juror Fingerprint Analysis*

Morris contends Juror No. 3 committed misconduct by using her own vehicle to place her hand in positions consistent with the photographs of Morris's fingerprints. He argues this was an out of court experiment resulting in new evidence because her vehicle was most likely dissimilar to the vehicle involved in the shooting and she did not have precise details about the position of the seats in the car, the measurements of the door height or how many inches the window was down. We are not persuaded.

13

Jurors are not permitted to conduct their own investigation outside the courtroom. (*People v. Conkling* (1896) 111 Cal. 616, 628.) However, " '[n]ot every experiment constitutes jury misconduct. "[J]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts." ' " (*People v. Bogle* (1995) 41 Cal.App.4th 770, 778 (*Bogle*).) Jurors may use an exhibit " 'according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter.' " (*Collins, supra,* 49 Cal.4th at p. 243, quoting *Higgins v. L.A. Gas & Electric Co.* (1911) 159 Cal. 651, 656.)

In *Collins*, *supra*, 49 Cal.4th at pages 243 through 247, the Supreme Court analyzed a number of cases involving appropriate jury examination. One such case was *Taylor v. Commonwealth* (1893) 90 Va. 109 [17 S.E. 812] in which a murder defendant introduced his rifle and four empty shells fired from it to show evidence presented by the prosecution of expended cartridges from such a rifle could not have come from his rifle. During deliberations, the jury disassembled the rifle and, after examining the firing pin, determined it had been tampered with. The Supreme Court concluded the jury's examination of the gun was proper. "The jury examined the rifle to weigh the evidence that had been given. The question of whether defendant's rifle had fired the shells recovered at the scene was squarely raised. Their examination of the gun did not invade a new field and fairly fell within the scope and purview of the evidence received." (*Collins*, at p. 244.)

The court in *Collins*, *supra,* 49 Cal.4th 175 also described *Bogle*, *supra*, 41 Cal.App.4th 770, as an example of proper jury experimentation. In *Bogle*, the trial court found the jury's use of two exhibits, the defendant's set of keys and the murder victims' safe, was not a prohibited jury experiment. The trial court compared that situation "to one in which a jury is given a picture and sees something in the picture that adds insight into the case but was not pointed out during testimony." (*Bogle*, at p. 778.) Since the set of keys and the safe were introduced into evidence, "the jury was entitled to determine, from the evidence it was given, the character and extent of the defendant's relationship to the safe. Trying the keys on the safe was an exercise in that pursuit, not a foray into a new field." (*Id.* at p. 780.) A jury can reexamine "the evidence in a slightly different context" than was presented at trial, to assist it in reaching a verdict. (*Id.* at p. 781.)

Similarly, there was no misconduct in a case where a jury reenacted testimony and a demonstration about how police officers observed the defendant toss a shiny object onto a lawn about 15 feet away, where a bag of heroin was recovered. " 'The jurors simply repeated the officer's reenactment. Nothing requires that the jury's deliberations be entirely verbal, and we would expect a conscientious jury to closely examine the testimony of the witnesses, no less so when that testimony takes the form of a physical act.' " (*Collins*, *supra*, 49 Cal.4th at p. 245, quoting *People v. Cooper* (1979) 95 Cal.App.3d 844, 854.)

After comparing cases involving appropriate jury investigation to those where jury examination was inappropriate, the *Collins* court distilled several principles: "Not every

15

jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' " (*Collins*, *supra*, 49 Cal.4th at p. 249.)

Applying these principles, the *Collins* court determined the jurors' use of a string, a protractor and a juror assuming various positions to reconstruct and demonstrate bullet trajectory did not go beyond the record in evaluating the evidence presented at trial. (*Collins*, *supra*, 49 Cal.4th at pp. 250-252.) "Their evaluation critically considered the evidence presented. It did not invade a new field." (*Id.* at p. 252.)

Additionally, the *Collins* court concluded a juror's use of his home computer to diagram the bullet trajectory based on his recollection of the evidence was not misconduct. This was "simply his permissible thinking about the evidence received, and was not an experiment resulting in the acquisition of any new facts." (*Collins*, *supra*, 49 Cal.4th at p. 252.) "He drew the diagram to test his own view of the evidence, which allowed him to argue his position to the jury. Making the diagram did not exceed the boundaries of proper conduct." (*Id.* at p. 255.) Nor was it impermissible for the juror to analyze the evidence outside the presence of other jurors because a juror is "not limited to thinking about the case in the deliberation room." (*Id.* at p. 253.)

16

In *People v. Engstrom* (2011) 201 Cal.App.4th 174, 188 the Court of Appeal followed *Collins*, *supra,* 49 Cal.4th 175 and concluded it was not misconduct for jurors to revise a factor in a defense expert's formula to determine a defendant's marijuana garden yield and to recalculate the potential yield based on that revision. The court concluded the jurors undertook a reasonable interpretation of the formula and applied the evidence admitted at trial to recalculate the yield. This was not juror misconduct "so long, as here, no extrinsic evidence came into play." (*People v. Engstrom*, *supra*, at p. 188)

2

Here, Juror No. 3's placement of her hands on her car based on her recollection of the fingerprint and photographic evidence did not go beyond the scope and purview of the evidence. The evidence included testimony and numerous photographs illustrating where Morris's fingerprints were found on the vehicle along with photographs of a detective demonstrating various hand positions consistent with where the prints were found. The People presented testimony about how the print cards were placed on the vehicle in the location from which the prints were collected and how the detective placed his hands to match the prints from various positions. The detective was able to match his left hand to the prints on the passenger window from the front passenger's seat in a comfortable, relaxed position. However, he could not match the prints as comfortably when attempting to do so by standing outside the car, either with the door open or closed.

Juror No. 3 repeated the detective's photo demonstration as a permissible critical analysis of the evidence. Her conduct was part of her individual contemplation of the evidence after the matter was submitted to the jury. (*Collins*, *supra*, 49 Cal.4th at p. 256.)

17

The facts here are distinguishable from those in *People v. Conkling* (1896) 111 Cal. 616, 627 (*Conkling*), where a critical issue involved the distance between the defendant and the deceased victim and the victim's clothes showed no powder burns. The jurors in that case fired a similar rifle to determine "at what distance powder marks would be carried by the fire." (*Ibid.*) The court held the juror's desire to get to the truth of the matter was too zealous because jurors are required to decide the case based upon the evidence introduced at trial. (*Id.* at p. 628.) Similarly, misconduct was found in *People v. Castro* (1986) 184 Cal.App.3d 849, 854 (*Castro*), where a juror used binoculars to see if a correctional officer could identify an inmate as participating in arson 50 to 100 yards away using binoculars because the experiment enabled the juror to receive evidence outside the presence and knowledge of the defendant. The *Collins* court distinguished both of these cases as creating "extraneous evidence not admitted at trial." (*Collins*, *supra*, 49 Cal.4th at p. 256.)

Finally, the facts here are distinguishable from *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1486 (*Vigil*), where a juror "crossed the line into misconduct" by conducting an experiment outside the courtroom to determine if the driver of a vehicle knew in advance another defendant was going to commit a drive-by shooting. The juror used a broomstick to simulate a rifle and did not take into account certain variables in evidence such as the interior of the car, the height and weight of the driver or the shooter. He assumed, without evidentiary support, the shooter was right-handed and had to roll down the window of the vehicle before shooting. The juror then reported his experiment to the other jurors. (*Ibid.*) The appellate court found this scenario more similar to the

18

facts of *Conkling*, *supra*, 111 Cal. 616 and *Castro*, *supra,* 184 Cal.App.3d 849 than to cases "that merely involve careful examination of exhibits or conducting a test or demonstration that did not stray beyond the admitted evidence." (*Vigil*, *supra,* at p. 1486*.*)  The court noted the jury could have used the actual rifle admitted into evidence to reenact the shooting for purposes of debate, but it did not.  Instead, the juror's "homemade experiment produced new evidence ' "without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." ' " (*Id*. at p. 1487.)

In this case, Juror No. 3's replication of the detective's fingerprint demonstration falls within the line of cases permitting careful examination of the evidence presented at trial.  It did not produce extraneous evidence and did not constitute misconduct.

B.      *Internet Search*

1

Jurors are not permitted to conduct independent research, including electronic or Internet research, on any subject connected with the trial.  (§ 1122, subd. (a)(1)-(2); *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1466.)  " '[W]here a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance . . . which suggests a *likelihood* that one or more members of the jury were influenced by improper bias.' [Citation.]  A juror who 'consciously receives outside information . . . or shares improper information with other jurors' commits misconduct.  [Citation.]  Jury misconduct 'raises a rebuttable "presumption" of prejudice.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 192 (*Tafoya*).)

19

"We assess prejudice by a review of the entire record. 'The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.' " (*Tafoya*, *supra*, 42 Cal.4th at p. 192.)

However, before we set aside a unanimous verdict, we must determine the likelihood of bias is substantial. " '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness.' " (*People v. Danks* (2004) 32 Cal.4th 269, 304.)

"In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.) "In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized." (*Tafoya*, *supra*, 42 Cal.4th at p. 192.) Further, "[a]n admonition by the trial court may also dispel the presumption of prejudice arising from any misconduct." (*Tafoya*, at pp. 192-193.)

20

In this case, based on the entire record, we conclude there is no substantial likelihood of bias. Presuming Juror No. 5 conducted an Internet search as reported, the only evidence of what she learned was from another juror's statement who said Juror No. 5 reported Mason would go to trial for the Velma Terrace murders shortly after the Morris trial concluded.[5] Mason was identified during the trial as a suspect in the Velma Terrace murders and at least one photograph of Mason was admitted during the Morris trial. Evidence regarding Mason's DNA being found at Velma Terrace was also before the jury. However, the court instructed the jury they were not to speculate about whether other defendants would be tried. Therefore, information about Mason going to trial was not inherently and substantially likely to have influenced the juror as to Morris.

The record shows the jury reached a unanimous verdict against Morris on the Guthrie Way charges fairly quickly, but did not reach a verdict against Morris on the Velma Terrace charges. Thus, there is no indication information about Mason facing charges related to Velma Terrace had a substantial impact on the juror in question or the jury's deliberation regarding Morris's conviction for the Guthrie Way shootings. Therefore, we conclude there was no substantial likelihood of actual bias.

---

[5] Evidence Code section 1150 prohibits our consideration of evidence "to show the effect of" conduct outside the jury room "upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

## C. Denial of Evidentiary Hearing

Morris contends the trial court abused its discretion in denying an evidentiary hearing on the issue of juror misconduct. Morris contends two jurors engaged in "highly questionable conduct" and the court should have inquired "into the extent and precise nature of the behavior cited in the new trial motion." We disagree.

"The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct. [Citation.] 'Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is "necessary to resolve material, disputed issues of fact." [Citation.] "The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." ' [Citation.] The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion." (*People v. Dykes* (2009) 46 Cal.4th 731, 809-810.)

Here, Morris presented declarations from two jurors and an attorney and an investigator about statements made by two other jurors, all of which were based on hearsay. "[O]rdinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 810.)

22

The trial court considered the request for a hearing. It was not persuaded to require jurors who were reluctant to sign declarations to come into court to testify about their out of court statements and conduct because to do so could compromise the justice system.

In *People v. Cox* (1991) 53 Cal.3d 618, the Supreme Court cautioned against the use of evidentiary hearings in such instances: "A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict. . . . [¶] . . . [R]equiring testimony under such circumstances is tantamount to [a] 'fishing expedition' . . . . Either a juror is willing to come forward and, at least on a preliminary basis, sign an affidavit or not. Unless the reticence results from impermissible interference by the court or prosecutor, the reasons therefor should not be subject to further inquiry." (*Id.* at pp. 698-699, overruled on another point in *People v. Doolin* (2009) 53 Cal.3d 618, 661-662.) " 'To grant this kind of power to the losing attorney would open the door to harassment of jurors and . . . ultimately damage the jury process and the administration of justice.' " (*People v. Cox*, *supra*, at p. 699.)

We see no reason to depart from the general rule in this case. Morris did not present a factual dispute about what misconduct was alleged to have occurred. Although the juror accused of conducting an Internet search denied doing so in an unsworn statement, the trial court presumed for purposes of analysis both jurors did what was reported, but found no prejudicial misconduct. Under these circumstances, we conclude the trial court acted within its discretion in deciding the motion for new trial without holding an evidentiary hearing. (*People v. Davis* (2009) 46 Cal.4th 539, 625.)

23

## II

### *Evidentiary Rulings*

Morris contends the trial court abused its discretion and deprived him of a fair trial when it admitted evidence of his 1996 flight from law enforcement arguing the evidence was not probative for consciousness of guilt, did not demonstrate a common plan or scheme under Evidence Code section 1101, subdivision (b), and was more prejudicial than probative under Evidence Code section 352. Morris also contends the court abused its discretion in excluding evidence of other police contacts after 1996 where he did not flee.

"We review claims regarding a trial court's ruling on admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) Applying this standard, we conclude the court did not err either in admitting evidence of the 1996 flight or in excluding evidence of subsequent police encounters where Morris did not flee.

A.  *No Abuse of Discretion In Admitting The 1996 Flight Evidence*

All relevant evidence is admissible, except as otherwise provided by law. (Evid. Code, § 351.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission

will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).)

In *People v. Mason* (1991) 52 Cal.3d 909 the Supreme Court held the trial court did not abuse its discretion in admitting evidence the defendant led sheriff deputies on a high-speed automobile chase four weeks after a murder to show consciousness of guilt. (*Id*. at pp. 924, 941-942.) "Common sense . . . suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murders after only a few weeks. Nor do our decisions create inflexible rules about the required proximity between crime and flight. Instead, the facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*Id*. at p. 941.) The Supreme Court rejected the defendant's argument the admission of the evidence was prejudicial because it required him to admit uncharged crimes to explain the flight. The court stated, "the existence of other crimes which may explain the defendant's flight goes to the weight, not to the admissibility, of evidence." (*Id*. at p. 942.)

Here, weeks after the Guthrie Way drive-by shooting, Morris was seen running out of an alley near where gunshots were fired. After initially stopping for police, he pulled away from an officer attempting to detain him and led officers on a foot chase followed by a high-speed vehicle chase in which Morris's car became airborne and crashed into a pole. When the vehicle came to rest, Morris again attempted to run until he was apprehended by officers.

This was circumstantial evidence for the jury to consider along with other evidence connecting Morris to the Guthrie Way shootings. The jury could consider

25

evidence of this extensive chase along with more direct evidence such as Morris's fingerprints on the vehicle used in the Guthrie Way shootings, his denial of knowledge of the vehicle in spite of the fingerprint evidence, Morris's admitted affiliation with the Lincoln Park gang and the violent rivalry between the Lincoln Park gang and the Skyline gang (whose territory encompassed Guthrie Way). A reasonable inference from the totality of the evidence is Morris fled based on consciousness of guilt related to the Guthrie Way shootings, which had occurred only weeks before.

That does not have to be the only inference to permit admission of the evidence. The defense argued alternative reasons why Morris could have run, such as because he was on parole with CYA conditions or because he was near the scene of an incident involving substantial gunfire and wanted to avoid detention for a parole violation or for the immediate shooting incident. However, other possible motives for fleeing, either separately or in combination, go to the weight, not the admissibility, of the evidence. Although " 'evidence [of flight] does not specifically and directly evidence consciousness of guilt of the [charged crime] . . . any more than it evidences consciousness of guilt of [the uncharged offenses],' nevertheless '[i]t [is] for the jury to determine the weight, if any, against defendants of such evidence.' " (*People v. Mason*, *supra*, 52 Cal.3d at p. 942.)

The evidence of the January 1996 flight was not more prejudicial than probative. The court did not allow extensive testimony about the incident and, at the request of defense counsel, precluded evidence the officer who chased Morris was seriously injured after falling off an embankment during the pursuit. The testimony from the two officers

26

regarding the 1996 flight incident took less than 45 minutes out of a trial lasting more than a month.

The prosecution did not emphasize the flight evidence or use it to "dirty" Morris as Morris argues. Evidence the flight from police occurred near a shooting incident did not come out until cross-examination. After the officers testified about the flight, based on agreement of counsel, the court instructed the jury regarding the limited purpose of the evidence pursuant to CALCRIM No. 303 and gave a modified CALCRIM No. 372 instruction regarding consciousness of guilt. With respect to consciousness of guilt, the court stated: "[I]f you find that in fact Mr. Morris fled the scene of the 13 January '96 incident or incidents that we've heard about here, . . . you may—key word there is 'may'—find that that conduct on his part shows that he was aware of his guilt of the Guthrie crimes. The key word there is 'may.' Because if you find that he fled from that January situation, . . . you have to decide the significance of that evidence in terms of the Guthrie incident. [¶] And . . . you may or may not find that that shows some consciousness of guilt on his part. That's entirely for you to decide. That's a question of fact and you [are] the judges of the fact. [¶] However, evidence that he did flee from the January incident . . . certainly cannot by itself prove guilt of the Guthrie incident." The prosecution did not argue the flight as evidence of consciousness of guilt until rebuttal argument, after defense counsel raised the issue.

Under these circumstances, we cannot conclude the trial court abused its discretion or deprived Morris of his constitutional due process rights by admitting evidence regarding the 1996 flight as evidence relevant to consciousness of guilt or in determining

27

the evidence was more probative than prejudicial under Evidence Code section 352, subdivision (b). Given our conclusion, we do not reach the issue of whether the evidence was admissible under Evidence Code section 1101, subdivision (b), as evidence of a common plan.

  *B. No Abuse of Discretion in Excluding Subsequent Police Contact Evidence*

  Morris sought to introduce evidence of more than 30 police contacts with Morris between October 1997 and February 2008 asserting he did not run during these contacts. Morris contends on appeal this information was necessary to rebut the inference consciousness of guilt caused Morris to flee during the 1996 contact as opposed to other explanations for his flight, such as because he was on parole. We are not persuaded and conclude the trial court did not abuse its discretion in excluding evidence of subsequent police contacts with Morris, which occurred years after the Guthrie Way shooting.

  Our high court has consistently held "evidence that the defendant did not flee from a crime scene is inadmissible to show consciousness of innocence, even though such evidence has 'some "tendency in reason" to prove this fact.' " (*People v. Cowan* (2010) 50 Cal.4th 401, 472 (*Cowan*).) As the Supreme Court explained, "inferences arising from evidence of the absence of flight are ambiguous because 'there are plausible reasons why a guilty person might also refrain from flight,' such as fear of recapture or confidence that flight will be unnecessary because there is no strong proof of guilt. [Citations.] Moreover, such evidence also creates a 'substantial danger "of confusing the issues, or of misleading the jury." ' [Citations.] Because 'the absence of flight is so ambiguous, [and] so laden with conflicting interpretations . . . in all cases the scales tip so heavily against

28

admission of evidence of absence of flight that it must be excluded as a matter of law.' " (*Id*. at pp. 472-473.) The *Cowan* court applied the same reasoning to a defendant's offer to speak to the police. The court observed there are many reasons a guilty person might cooperate with police, the defendant "may desire to appear innocent, or he may desire to lie to the police to deflect suspicion from himself or to present a false alibi." (*Id*. at p. 473.) The slight probative value of such evidence is outweighed by the strong risk of confusing the issues or prolonging the trial by requiring the prosecution to explain the circumstances of the offer and to present evidence negating an inference of innocence. (*Ibid*.)

The *Cowan* court rejected an argument this rule offends notions of due process and fairness because it treats consciousness of guilt and consciousness of innocence evidence disparately. Since a defendant is entitled to explain any evidence of prearrest lack of cooperation, the court perceived no unfairness in refusing to allow a defendant to present evidence of instances of cooperation with police. (*Cowan, supra,* 50 Cal.4th at p. 474.) In so holding, the court noted " '[s]ince flight and the absence of flight are not on similar logical or legal footings, the due process notions of fairness and parity . . . are inapplicable.' " (*Ibid.*, quoting *People v. Williams* (1997) 55 Cal.App.4th 648, 653.)

Although recognizing this general rule prohibiting evidence of lack of flight, Morris argues evidence of his subsequent police encounters and his failure to flee in those instances should have been admitted, not as evidence of consciousness of innocence, but to rebut an inference of consciousness of guilt based on the 1996 flight. Morris analogizes this to sexual offense cases where a defendant may present evidence of

29

specific instances of good conduct to rebut prosecution evidence of prior uncharged sex offenses under Evidence Code section 1108 to show a propensity to commit sex offenses. (*People v. Callahan* (1999) 74 Cal.App.4th 356, 378, 379 (*Callahan*).)

The analogy is inapt. Evidence Code section 1108 itself is an exception to the general rule prohibiting character evidence in the form of specific acts. (Evid. Code, § 1101; *Callahan*, *supra*, 74 Cal.App.4th at p. 367.) In enacting Evidence Code section 1108, " 'the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness." ' " (*Callahan*, at p. 367.) In those instances, where the prosecution presents evidence of other sexual offenses to place in issue a character trait of the defendant, i.e. a propensity to commit sexual offenses, courts have permitted a defendant to rebut this character evidence by introducing "any or all of the three types of character evidence—opinion evidence, reputation evidence, and evidence of specific incidents of conduct." (*Id*. at pp. 378-379.)

The prosecution in this case did not introduce evidence of the 1996 flight as character evidence of Morris's propensity to run or not to run. It introduced evidence of the 1996 police encounter and the flight as evidence having some tendency to prove he fled on that one occasion based on consciousness of guilt related to the Guthrie Way shooting, which occurred just weeks before. When defense counsel asked for "leeway" to rebut the consciousness of guilt inference from the 1996 flight, the court stated, "[t]he leeway you have . . . is to show the other reasonable explanations of why he ran; that he

30

was on juvenile parole and that, ah, he just inadvertently got in—just happened to be in the wrong place at the wrong time."

This complies with the well-established law and we see no reason to depart from the general rule in this case. Given the minimal probative value of evidence of police encounters two to 12 years after the Guthrie Way shootings and the likelihood the introduction of such evidence would confuse the issues and prolong an already lengthy trial, we conclude the trial court properly excluded the evidence. (*People v. Cowan, supra*, 50 Cal.4th at p. 473.)[6]

### III

### *Jury Instructions*

Morris asserts two instructional errors. First, Morris contends the instructions for murder and attempted murder confused the jury regarding the necessary mental state for attempted murder. Second, he contends the instructions regarding consciousness of guilt based on either suppression of evidence or flight (CALCRIM Nos. 371-372) violate due process because they embody an unreasonable permissive inference.

---

[6]    We note the trial court precluded the People from putting on evidence regarding a February 2008 incident in the South Bay courthouse, which they contended suggested consciousness of guilt. Detectives, who had received information about a possible DNA match with Morris related to the Velma Terrace incident, attempted to talk to Morris as he left a courtroom after an appearance in an unrelated criminal proceeding. Morris informed the officers he did not want to talk to them, went down an escalator quickly and essentially jogged out of the courthouse. The court ruled this evidence was not admissible under Evidence Code section 352 because the probative value was very slight. This is one of the incidents Morris sought to introduce as evidence of lack of flight. If the court had allowed evidence of these subsequent contacts, it is very likely substantial time would have been necessary for both sides to explain the events and it would have confused the issues for the jury.

31

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

A.      *Murder and Attempted Murder Instructions*

The " 'mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices.  [Citation.]' [Citation.]  In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Morris concedes the court's use of pattern instructions for murder (CALCRIM No. 520) and for attempted murder (CALCRIM No. 600) correctly set forth the elements of the respective crimes.  However, he argues the instructions were inconsistent when read in combination and were likely to confuse the jurors as to the mental state necessary for attempted murder.  We disagree.

In *People v. Beck* (2005) 126 Cal.App.4th 518, 522, an attempted murder case, the court gave the pattern jury instruction for attempted murder, which the appellate court determined expressed with "sufficient clarity the requirement that attempted murder requires the specific intent to kill."  However, immediately after the attempted murder instruction, the court gave an instruction introducing the concept of implied malice and informing the jury "either express or implied malice would 'establish the mental state of

32

malice aforethought.' " (*Id.* at p. 523.) The prosecutor complicated the problem by arguing implied malice was sufficient to find attempted murder. (*Id.* at pp. 523, 525.) The appellate court concluded the instructional error was not harmless and reversed. (*Id.* at p. 525.)

In this case, the court gave the pattern jury instructions for murder (CALCRIM Nos. 520-521) with respect to three counts of murder, including the count regarding the murder of Villarreal. It also gave the pattern jury instruction for the attempted murder of Theobalds (CALCRIM No. 600.) Reading the instructions as a whole, along with oral clarifications by the court, we conclude there was no error or a reasonable likelihood the jury misapplied the instructions.

As to murder, the court instructed as follows: "To prove a person guilty of the crime of murder, the People must prove that: [¶] [t]he accused committed an act that caused the death of another person; and, [¶] [w]hen he acted, he had a state of mind which the law defines as malice aforethought. [¶] So the basic, generic, fundamental definition of murder is the unlawful killing of one human being by another with malice aforethought.

"There are two kinds of malice aforethought: Express malice and implied malice. And proof of either one is sufficient to establish the essential element of traditional or basic murder, killing of one human being by another with malice aforethought. [¶] An accused acts with express malice if he unlawfully intended to kill another human being. So that's the specific intent to kill another human being."

33

Before discussing implied malice, the court reiterated the difference between express and implied malice saying: "Again, *express malice, the intent to kill*." (Italics added.)

The court then defined implied malice, "you intentionally commit an act—you willfully, purposely, knowingly; not unintentionally or inadvertently—commit an act that the natural and probable consequences of that act were dangerous to human life; [¶] [a]t the time you acted, you knew of that danger to human life. You knew that that was an act which was dangerous to human life. [¶] So you intentionally do the act. The act itself is dangerous to human life. [¶] And you knew, you appreciated, you understood that the act was dangerous to human life and you deliberately committed the act . . . with conscious disregard for that human life and that danger to that human life.

"If all those elements are proved beyond a reasonable doubt, then you are said to have acted with implied malice as opposed to express malice. [¶] And either—either form satisfies the requirement of malice aforethought as the basic, generic definition of murder."

After giving the general definition of murder, the court explained murder in the second degree does not require premeditation, whereas murder in the first degree does. After explaining the prosecution would be asking the jury to find first degree murder for count 1 regarding Villarreal and for the murder counts related to Velma Terrace, the court gave the pattern first degree murder instruction (CALCRIM No. 521), which identifies three theories under which murder in the first degree may be found. In addition to generic premeditation, the court explained murder by shooting a firearm from a motor

34

vehicle might apply to Guthrie Way to elevate a murder to first degree and the felony murder rule might apply to elevate the Velma Terrace murder charges to first degree.

Expanding on the pattern instruction for first degree murder, the court explained premeditation. "[L]et's look then at what I just referred to a moment ago of murder in the first degree on sort of a traditional or basic, generic definition. And that's adding to the unlawful killing with malice aforethought deliberation and premeditation. *So, by definition, for that murder, the first degree, we're dealing with express malice. There has to be an intent to kill*. And that intent has to be the result of premeditation and deliberation. [¶] So for murder—finding of guilty of murder under the first degree, under that theory, the People must prove to you beyond a reasonable doubt that [Morris] acted willfully, deliberately and with premeditation. [¶] He *acted willfully if he intended to kill. So that's the express malice*." (Italics added.)

The court explained the elements for discharge from a vehicle includes "[f]irst, that he in fact shot a firearm from a motor vehicle; [¶] [t]hat he intentionally shot at a person who was outside the vehicle; and, lastly, [¶] [t]hat *he intended to kill* that person." (Italics added.) The court then gave the felony murder instruction regarding the Velma Terrace counts.

The court next gave the pattern jury instruction for attempted murder (CALCRIM No. 600) for count 2, attempted murder regarding Theobalds: "Attempted murder. We've already talked about murder. And under our law, an attempt to commit a . . . crime is itself a crime. [¶] To prove guilt of attempted murder as alleged in Count 2, the People must prove—again, beyond a reasonable doubt. That's the constant, that's

35

always the burden, beyond a reasonable doubt—that: [¶] [Morris] took at least one direct but ineffective step towards the killing of another person; and, [¶] [t]hat he *intended to kill* that person. [¶] A direct step requires more than merely planning or preparing to commit a crime—in this case, murder—or even obtaining or arranging for something needed to commit the murder. [¶] So a direct step is something that goes beyond planning or preparation and shows that the person is actually putting his plan into action. [¶] *A direct step indicates a definite and unambiguous intent to kill.* It's a direct movement towards the commission of the crime after preparations are made. It's an immediate step that puts the plan in motion so that the plan would have been completed in some circumstances outside the plan and not interrupted the attempt." (Italics added.)

In contrast to *Beck*, *supra*, 126 Cal.App.4th 518 the prosecutor's closing argument in this case explained, "for attempted murder, although we have it here, there isn't an implied malice type of thing. *You have to have the intent to kill for attempt murder*. And you have to take a step toward killing." (Italics added.)

The court clarified several times the difference between express and implied malice and noted if they found Morris acted willfully, deliberately and with premeditation, they would find express malice. The court's differentiation regarding the counts and victims for murder and attempted murder, as well as the separation between the general murder instruction and the attempted murder instruction sufficiently avoided possible confusion. In addition, the prosecutor's argument emphasized an express intent to kill is necessary for attempted murder.

36

The jury found Morris guilty of the first degree murder of Villarreal, meaning under either the theory of willfulness and premeditation or the theory of discharge of a firearm, the jury found an intent to kill, i.e. express malice. The jury also found Morris guilty of the attempted murder of Theobalds and that the attempted murder was "willful, deliberate and premeditated." Therefore, as defined, the jury found express malice for the attempted murder of Theobalds.

Considering the entire record and reading the instructions as a whole, we see no reasonable likelihood the jury could have been confused over the requirements for the mental state necessary to prove attempted murder. Nor is there any indication the jury was confused or applied the instructions in an impermissible manner.

*B.     CALCRIM Nos. 371 and 372*

Morris also contends the court's use of CALCRIM No. 371 (suppression or fabrication of evidence as consciousness of guilt) and CALCRIM No. 372 (flight instruction) allowed the jury to make an irrational permissive inference of guilt and lowered the prosecution's burden in violation of due process. We are not persuaded.

In *People v. Mendoza* (2000) 24 Cal.4th 130 (*Mendoza*), the Supreme Court rejected a similar challenge to the predecessor flight instruction (CALJIC No. 2.52) in which the defendant argued the instruction created an unconstitutional permissive inference. (*Mendoza*, *supra*, at p. 179.) Observing there must be "a relationship between the permissively inferred fact and the proven fact on which it depends" to conform with the due process requirements of the federal Constitution (U.S. Const., 5th & 14th Amends.), the court stated a permissive inference still requires the prosecution "to

37

convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." (*Mendoza*, at p. 180.) " 'A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' " (*Ibid.*)

Applying this standard, the *Mendoza* court held the predecessor flight instruction did not violate due process because it permits "a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt." (*Mendoza*, *supra*, at p. 180, italics added.) "The instruction informs the jury that it may consider flight in connection with all other proven facts, giving the fact of flight the weight the jury deems appropriate." (*Id.* at pp. 180-181.)

Morris argues the phrase "aware of his guilt," used in the CALCRIM instruction Nos. 371 and 372, equates suppression of evidence or flight with guilt rather than suggesting "a mere consciousness of guilt," as described by the Supreme Court in *Mendoza*.[7] Morris argues a person "could have a vague, generalized consciousness of guilt, akin to a guilty conscience, without having a specific awareness of his guilt in a particular matter" whereas the phrase " 'aware of his guilt' leaves no room for a conclusion that the defendant was not guilty." We do not agree.

The appellate court in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1159 (*Hernandez Rios*) relied on *Mendoza*, *supra*, 24 Cal.4th 130 to reject an identical argument with respect to CALCRIM No. 372. After analyzing the definitions of

_____

7    The phrase "consciousness of guilt" does not appear in CALJIC No. 2.52, but comes from *Mendoza*. (See *Mendoza*, *supra*, 24 Cal.4th at p. 180.)

38

"awareness" and "consciousness," the court concluded they are essentially the same for constitutional purposes. "[T]he special awareness that *Mendoza,* [*supra,* 24 Cal.4th 130] allows a jury to infer from a flight instruction is . . . 'consciousness of guilt' . . . ." (*Hernandez Rios, supra*, at p. 1159.) Since the inference in the predecessor instruction passed constitutional muster, so does the inference in CALCRIM 372. (*Hernandez Rios*, at p. 1159.) We agree with the reasoning in *Hernandez Rios* and apply it equally to both CALCRIM Nos. 371 and 372.

Even if the pattern instructions could be viewed as containing impermissible inferences, any error was harmless because there was no reasonable likelihood the jury applied the instructions in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) Using pattern instructions CALCRIM No. 371 for suppression of evidence the court instructed the jury as follows: "If you find—and 'if you find,' of course, that emphasizes you have to do the fact finding based solely on the evidence—but if you find that [Morris] tried to hide evidence or discouraged someone from testifying against him, that conduct *may, may* show that he was aware of his guilt. [¶] If you conclude that he made such an attempt, it's up to you to decide the meaning and importance of that finding, that evidence, your conclusions in that regard. *But evidence of such an attempt cannot by itself prove guilt of the crime or the truth of an allegation*.

"If he tried to create false evidence or obtain false testimony, that conduct may likewise show that he was aware of his guilt. *It may. May not. That's a question of fact for you to decide.* But if you conclude that he made such an attempt, again, it's up to you to decide the meaning and importance of that effort on his part.

39

"But, again, that's not enough to prove guilt or prove the truth of the allegation that someone other than [Morris] tried to create false evidence, provide false testimony, or hide or destroy evidence. Again, that conduct may show that he was aware of his guilt; but, only if he was either present or knew about that conduct, or if not present, authorized the other person's actions.

"Again, it's up to you to decide the importance and significance of whatever that evidence might be. *But, again, that sort of conduct by itself cannot prove his guilt.*" (Italics added.)

Using CALCRIM No. 372, the court instructed regarding defendant's flight as follows: "If you find that . . . Morris fled immediately after a crime was committed, that conduct may show that he was aware of his guilt. [¶] Again, if you conclude that he did flee, it's up to you to decide the meaning and importance of that conduct. Again, that conduct alone cannot prove his guilt."

The court's slight modifications of the instructions clarified the duty of the jury to make findings of fact based on the evidence and to decide the significance, or lack thereof, of any evidence of suppression or flight. In addition, the court gave the pattern instruction for reasonable doubt informing the jury to consider "all the evidence" when deciding if the prosecution proved its case beyond a reasonable doubt, meaning the evidence left them "with an abiding conviction that the charge is true." (CALCRIM No. 220.) It also instructed the jury, if it could draw two or more reasonable conclusions from the circumstantial evidence, one pointing to innocence and one pointing to guilt, it must accept the one pointing to innocence. (CALCRIM No. 224) Taking the instructions

40

and the record as a whole, we conclude any error was harmless beyond a reasonable doubt.  (*People v. Harris* (1994) 9 Cal.4th 407, 428-429.)

## IV

### *Restitution*

Morris contends the trial court's imposition of a $10,000 restitution fine in accordance with section 1204.4, subdivision (b)(1), violated his Sixth and Fourteenth Amendment as described in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) because the fine is based on facts found by the trial court, rather than facts reflected in a jury verdict.  We do not agree.

In *Apprendi*, the United States Supreme Court held:  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  (*Apprendi*, *supra,* 530 U.S. at p. 490.)  "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  (*Blakely v. Washington* (2004) 542 U.S. 296, 303, italics omitted.)  "[T]he rule of *Apprendi* applies to the imposition of criminal fines."  (*S. Union Co. v. United States* (2012) 567 U.S. ___ , ___ [132 S.Ct. 2344, 2357, 183 L.Ed.2d 318].)  However, "nothing in [the common law and constitutional history] suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to the offense and offender—in imposing a judgment *within the range* prescribed by statute."  (*Apprendi*, at p. 481.)

As part of sentencing, section 1202.4, subdivision (a)(3), requires the court to impose a restitution fine on a criminal defendant. For offenses committed before 2012, the statutory minimum restitution fine was $200 and the maximum was $10,000. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 349, fn. 2 (*Kramis*).) In *Kramis,* the Second District concluded *Apprendi*, *supra*, 530 U.S. 466 does not prohibit a court from exercising its discretion to impose a $10,000 restitution fine because it was within the statutory range. We agree with the *Kramis* rationale.

The trial court here imposed a $10,000 restitution fine. Because the court exercised its discretion within the range authorized by statute on the basis of facts reflected in the jury's verdict, i.e. defendant's felony conviction, the fine is proper under *Apprendi, supra*, 530 U.S. 466 and its progeny. (See *Kramis*, *supra*, 209 Cal.App.4th at p. 351.)

Morris also contends section 1202.4 sets a statutory maximum of $200, unless additional factual findings are made by the jury regarding the defendant's ability to pay. We are not persuaded. Section 1202.4 contemplates an exercise of discretion by the judge regarding factors relating to the offense and the offender in setting a fine within the prescribed range, as permitted by *Apprendi*. (See *Apprendi*, *supra*, 530 U.S. 466 at p. 481.) The court may determine the fine by multiplying the minimum fine by number of years of imprisonment the defendant is ordered to serve and multiplying again by the number of felony counts of which the defendant is convicted. (§ 1202.4, subd. (b)(2).) Using this formula, the restitution fine based on Morris's convictions would be substantially in excess of the $10,000 statutory maximum. Subdivisions (c) and (d) of

section 1202.4 describe factors the court either may or must take into account in setting a fine "in excess of the minimum fine." One such factor is the defendant's inability to pay. Other factors include "the seriousness and gravity of the offense and the circumstances of its commission," "the extent to which any other person suffered losses [pecuniary or intangible] as a result of the crime, and the number of victims involved in the crime." (§ 1202.4, subd. (d).) The court is not required to conduct a separate hearing regarding the fine and is not required to make express findings as to the factors bearing on the amount of the fine. (*Ibid.*)

To read the statute as Morris suggests—as requiring a court to have the jury make factual findings about the defendant's ability to pay an amount above the statutory minimum—is incompatible with both the plain language of the statute and prior appellate authority rejecting the notion *Apprendi*, *supra*, 530 U.S. 466 limited the trial court's discretion to select a fine within the range prescribed by section 1202.4, subdivision (b)(1). (See *Kramis*, *supra*, 209 Cal.App.4th at p. 351.) Accordingly, we conclude the trial court did not err in exercising its discretion to impose a $10,000 restitution fine within the confines of the statute.

Finally, we observe section 1202.4, subdivision (d) provides, "defendant shall bear the burden of demonstrating his or her inability to pay." In this case, there is no indication Morris raised inability to pay as a factor the court should consider in exercising its discretion in setting the amount of the fine. As such, even if we could construe the statute as Morris contends, he did not meet his burden of proof.

V

*Local Conduct Credits*

The trial court declined to award conduct credits based on section 2933.2, which provides that persons convicted of murder shall not accrue any work time credits in state prison, nor shall they earn any local credits pursuant to section 4019. As the People concede, the court erred because the statute does not apply to offenses committed prior to the law's effective date of June 3, 1998. (§ 2933.2, subd. (d); *People v Chism* (2014) 58 Cal.4th 1266, 1336, citing *People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1317.) Because Morris committed the Guthrie crimes in December 1995, before the effective date of the statute, we remand with directions to the trial court to calculate and award Morris appropriate presentence conduct credits as provided by law. (*Hutchins*, *supra*, at p. 1317.)

DISPOSITION

We reverse the judgment to the extent it denies appellant presentence conduct credits pursuant to section 2933.2 and remand for calculation and award of presentence conduct credit in accordance with the law in effect at the time of the offenses.  In all other respects, the judgment is affirmed.

_____

McCONNELL, P. J.

WE CONCUR:

_____

HALLER, J.

_____

McINTYRE, J.